UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SHALLOW WATER EQUIPMENT L.L.C. ET AL | CIVIL ACTION |
| VERSUS | NO. 21-949 |
| PONTCHARTRAIN PARTNERS, L.L.C. | SECTION "L" (4) |

## ORDER AND REASONS

Pending before the Court is a motion for partial summary judgment filed by Defendant Pontchartrain Partners, LLC. R. Doc. 62. Plaintiffs TK Boat Rentals, L.L.C. and Shallow Water Equipment, L.L.C. oppose the motion. R. Doc. 65. Ponchartrain Partners, LLC filed a reply, R. Doc. 66, and Plaintiffs field a sur-reply, R. Doc. 71. Having considered the parties' memoranda, the record, and the applicable law, the Court rule as follows.

### I.     BACKGROUND

This suit arises out of the charter and subcharter of the spud barge GRANT. R. Doc. 20 at 1.[1] Plaintiffs are TK Boat Rentals, LLC (TK), which owns the GRANT, and Shallow Water Equipment, LLC (Shallow Water), which chartered the GRANT from TK on or around February 24, 2020. Shortly thereafter, Shallow Water subchartered the barge to Pontchartrain Partners, LLC (Pontchartrain). *Id.* at 1-2.

Plaintiffs allege that Ponchartrain used the GRANT to perform work for the Army Corps of Engineers (Army Corps). In order to work for the Army Corps, Ponchartrain allegedly obtained and had in effect a bond pursuant to the Miller Act, 40 U.S.C. § 3131 *et seq.* (the Miller

---

[1] Jurisdiction is proper because this case concerns maritime contracts.

Act Bond) issued by Defendant Continental Casualty Company (Continental). *Id.* at 5. Additionally, Plaintiffs allege that five months into its subcharter, Ponchartrain obtained a hull and machinery insurance policy (the Policy) issued by Defendant Great American Insurance Company (Great American). *Id.* at 2.

Plaintiffs further allege that the subcharter required Pontchartrain to pay Shallow Water for the "on-hire and off-hire survey," plus $475/day. Shallow Water, in turn, is required to pay TK $400/day of charter hire. *Id.* at 3.

According to Plaintiffs, Pontchartrain stopped paying charter hire on the barge in January 2021. *Id.* at 3-4. Invoices allegedly show Pontchartrain Partners owed Shallow Water over $65,000 in charter hire—an amount that continues to accumulate and is subject to interest. *Id.* at 4.[2]

Additionally, Plaintiffs allege that, around November 2020, while the GRANT was on-hire to Pontchartrain, the barge sustained substantial damage, rendering the vessel "significantly less operable and profitable until repairs can be completed." *Id.* 4. Plaintiffs claim that "effectively identical" barges owned by TK are chartered for $800/day. Ponchartrain eventually returned the barge to TK.

TK seeks damages against Pontchartrain for (1) unpaid charter hire, (2) the total constructive loss of the grant (3) consequential damages resulting from failure to return the GRANT in its original condition, and (4) costs and interests. *Id.* at 4. Shallow Water seeks damages against Pontchartrain for (1) unpaid charter hire and (2) costs and interests. *Id.* at 5.

---

[2] Per the written charter party, interest accrues at a rate of 1.5% per month, compounded daily, on any invoice amounts that are not paid within 60 days of the due date. R. Doc. 20 at 4.

Plaintiffs also claims Pontchartrain's failure both to pay both charter hire and for damages to the GRANT "is a breach of the Miller Act [B]ond issued by Continental." *Id.* at 5. As a "first-tier subcontractor," Shallow Water alleges that it can recover against Continental pursuant to the Miller Act Bond. *Id.* at 5-6.[3]

Last, Plaintiffs allege that the Policy with Great American covered the damage to the GRANT but that Great American has refused to pay for the barge repairs. *Id.* At 6-7. Plaintiffs thus claim that Great American has violated La. R.S. §§ 22:1973 & 1892, by, among other things, failing to pay a claim within 30 days of satisfactory proof of loss and failing to make a written offer to settle a property damage claim within 30 days. *Id.* at 7. Plaintiffs make claims against Great American for the damages to the GRANT and lost charter hire to due to Great American's failure to timely pay for repairs. *Id.*

Defendant Pontchartrain generally denies liability. R. Doc. 10. Defendant Great American admits that it issued the Policy to Pontchartrain that covered the period of July 15, 2020 to July 15, 2021. R. Doc. 34 at 3. However, Great American alleges a number of defenses, including that there is no coverage under the Policy to the extent Pontchartrain failed to exercise due diligence to maintain the GRANT in a seaworthy condition. *Id.* at 1, 7, 8. Last, Defendant Continental also generally denies liability. R. Doc. 58.

Previously, this Court granted Defendant Continental's motion to dismiss for failure to state a claim as to TK's claims under the Miller Act because they were untimely under the Act and denied the motion as to Shallow Water's claims under the statute, as they are not time-barred by the Act. R. Doc. 56.

---

[3] TK also alleged that, as a "second-tier contractor," it could recover against Continental under the Miller Act, but TK eventually conceded this claim was time-barred under the Miller Act, and the Court dismissed it with prejudice. R. Doc. 56.

In addition, Shallow Water and Ponchartrain filed cross-motions for summary judgment. *Id.* Shallow Water argued that, under the parties' written contract, it was entitled to judgment holding that Ponchartrain is liable for lost charter because it returned the GRANT in a damaged condition. For its part, Ponchartrain contended that it did not breach the contract by returning the barge in a damaged condition and that, even if it did breach the contract, the terms of the written charter limited its liability to the costs of repair and interest thereon. The Court denied both motions, determining that fact issues precluded summary judgment. *Id.*

## II.   PRESENT MOTION

Defendant Pontchartrain again moves for partial summary judgment. R. Doc. 62. First, Ponchartrain asserts that, under the written charter agreement, it only owes rent to Shallow Water up to January 10, 2021—the date that the off-charter survey was completed. *Id.* at 2, 6-7.

Second, Pontchartrain contends that its failure to repair the GRANT before returning the vessel did not breach the terms of the written charter. And even if its failure to repair did breach the contract, Ponchartrain claims that its liability is limited by a liquidated damages provision to the cost of repairing the vessel. *Id.* at 5-6. In other words, Ponchartrain maintains that it is only liable to Shallow Water for the cost to repair the GRANT and has no liability for consequential damages—*i.e.*, lost charter hire—resulting from it returning the barge in a damaged condition.

Last, Pontchartrain argues that it has no liability to TK. This is so, according to Ponchartrain, because the subcharter agreement is solely between it and Shallow Water and because TK is not a third-party beneficiary to the subcharter. *Id.* at 3-4.

In sum, Ponchartrain seeks partial summary judgment (1) limiting its liability to Shallow Water to only (a) the cost of repairing the spud barge and (b) to any unpaid rent that accrued

prior to the off-charter survey that concluded on January 10, 2021, and (2) dismissing TK's claims against it.

Plaintiffs TK and Shallow Water oppose the motion. R. Doc. 65. They argue that Shallow Water and Ponchartrain were operating under an oral bareboat charter—not a written charter agreement. *Id.* at 2-6. And under the ordinary terms of an oral bareboat charter, Ponchartrain is liable both for damage to the vessel and consequential damages. *Id.* at 6.  Plaintiffs also contend that, even though TK did not have a direct contractual relationship with Ponchartrain, TK has a maritime tort or quasi-contract claim against Ponchartrain because Ponchartrain negligently damaged its vessel. *Id.* at 6-9.

### III.    LAW & ANALYSIS

#### A.  Summary Judgment Standard

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Anderson*, 477 U.S. at 249–50. In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Furthermore, a court must assess the evidence, review the facts and draw any appropriate inferences based on the evidence in the light most favorable to the party opposing summary judgment. *See Daniels v. City of Arlington*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

## B.  Discussion

Pontchartrain seeks a partial summary judgment holding that (1) it is not liable for consequential damages, (2) rent for the vessel stopped accruing following the conclusion of the off-charter survey on January 10, 2021, and (3) it has no liability to TK. R. Doc. 62. The Court will address these issues in turn. There is, however, a threshold matter that is central to the first two issues: whether the parties' agreement is governed by an oral or written charter. This issue is particularly significant because Ponchartrain's arguments all rest on the premise that the written charter constitutes the parties' operative agreement, while Plaintiffs aver that the oral agreement controls. Accordingly, the Court begins with this question.

### 1.  Whether the Oral or Written Agreement Controls

#### A.  Judicial Admission

As a preliminary matter, Ponchartrain argues that Plaintiffs have judicially admitted that the written charter party applies and therefore are proscribed from now arguing that the oral

agreement controls. R. Doc. 69 at 1-2. Ponchartrain points out that Plaintiffs' pleadings cite the written agreement and that the Statement of Uncontested Facts that Plaintiffs appended to their prior motion for summary judgment includes as an uncontested fact that the written charter party for the GRANT forms the "effective barge charter party" between the parties. R. Doc. 36-2 at 1.

"A judicial admission is a formal concession in the pleadings or stipulations by a party or counsel that is binding on the party making them." *Martinez v. Bally's Louisiana, Inc.*, 244 F.3d 474, 476 (5th Cir. 2001). A judicial admission 'has the effect of withdrawing a *fact* from contention.'" *Blankenship v. Buenger*, 653 F. App'x 330, 335 (5th Cir. 2016) (quoting *Martinez*, 244 F.3d at 476). "By contrast, an ordinary evidentiary admission is 'merely a statement of assertion or concession made for some independent purpose,' and it may be controverted or explained by the party who made it." *Martinez*, 244 F.3d at 476-77 (quoting *McNamara v. Miller*, 269 F.2d 511, 515 (D.C. Cir. 1959)). "'A judicial admission is conclusive, unless the court allows it to be withdrawn; ordinary evidentiary admissions, in contrast, may be controverted or explained by the party.'" *Id.* (quoting *Keller v. United States*, 58 F.3d 1194, 1199 n. 8 (7th Cir. 1995)). It is "'well-established" that courts retain "broad discretion to relieve parties from the consequences of judicial admissions in appropriate cases.'" *Kiln Underwriting Ltd. v. Jesuit High Sch. of New Orleans*, No. Civ.A. 06-4350, 2008 WL 4724390, at *12 (E.D. La. Oct. 24, 2008) (quoting *Electric Mobility Corp. v. Bourns Sensors/Controls, Inc.,* 87 F.Supp.2d 394, 406 (D.N.J. 2000); *accord Coral v. Gonse,* 330 F.2d 997, 998 n. 1 (4th Cir. 1964)).

To qualify as a judicial admission, a statement must be "(1) made in a judicial proceeding; (2) contrary to a fact essential to the theory of recovery; (3) deliberate, clear, and unequivocal; (4) such that giving it conclusive effect meets with public policy; and (5) about a

fact on which a judgment for the opposing party can be based." *In re TK Boat Rentals, LLC*, 411 F. Supp. 3d 351, 368 (E.D. La. 2019).

In this case, the statements by Plaintiffs that Ponchartrain cites do not rise to the level of a judicial admission. It is true that Plaintiffs alleged in successive complaints and represented in a document supporting their summary judgment motion that the written charter party governed. But this was based on Plaintiffs' counsel's understanding of the facts at the time these documents were filed. Only after undertaking further discovery—specifically, Ponchartrain's corporate deposition—did Plaintiffs' counsel become aware that there was an oral agreement to charter the GRANT and that the written charter was not delivered until more than seven months after the oral agreement. At this point, Plaintiffs changed their position, contending in their present submissions that the oral agreement controls.

Courts have consistently held that an "inadvertent misstatement" by counsel is not "conclusively binding" on his clients. *Hub Floral Corp. v. Royal Brass Corp.*, 454 F.2d 1226, 1228 (2d Cir. 1972) (citing *Taylor v. The Allis-Chalmers Mfg. Co.*, 320 F.Supp. 1381, 1385 (E.D.Pa. 1969), *aff'd*, 436 F.2d 416 (3d Cir. 1970)); *see also Coral*, 330 F.2d at 998 n.1 (observing that courts are disinclined to find that an "honest mistake" by counsel qualifies as a judicial admission). This is especially so when the opposing party suffers no prejudice from the Court declining to find a judicial admission. *See, e.g.*, *Kiln Underwriting Ltd.*, No. CIV.A. 06-4350, 2008 WL 4724390, at *7. Here, Plaintiffs' counsel made early accidental misstatements of facts that were understandable given his knowledge at the time of the misstatements. Through the tools of discovery, counsel realized his error and promptly corrected it. This sort of development occurs not infrequently in litigation. Furthermore, there is no unfairness to Ponchartrain from permitting Plaintiffs' counsel to rely upon newly-discovered facts—facts that

were known to, and indeed, obtained from Ponchartrain itself. Thus, to bar counsel now from using this information obtained through discovery and instead to give binding effect to counsel's honest mistake would be contrary to public policy. Accordingly, the doctrine of judicial admission is inapplicable, and even if its requirements were met, the Court would exercise its discretion not to apply it as doing so would be manifestly unjust. *See Kiln Underwriting Ltd. v. Jesuit High Sch. of New Orleans*, No. Civ.A. 06-4350, 2008 WL 4724390, at *12; *In re TK Boat Rentals, LLC*, 411 F. Supp. 3d at 368.

## B.  Formation of Oral and Written Charters

The existence and interpretation of a maritime contract involves both questions of fact and law. *Ham Marine, Inc. v. Dresser Indus., Inc.*, 72 F.3d 454. Under admiralty law, "oral contracts are generally regarded as valid." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961). But the terms of an oral agreement may be supplemented by provisions in a subsequently-issued written agreement. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011). This supplementation by a later writing is permissible where a prior course of dealing between the parties establishes that they "were aware of consented to those additional contractual terms." *Id.* (first citing Restatement (Second) of Contracts [hereinafter "Restatement of Contracts"] § 223(1) (1981) (defining "course of dealing" as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"); then citing Restatement of Contracts § 223(2) ("Unless otherwise agreed, a course of dealing between the parties gives meaning to or supplements or qualifies their agreement.").[4]

---

[4] Federal maritime law incorporates general principles of contract construction, which "can be found in treatises or restatements of the law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (internal quotations marks omitted).

The burden of establishing a course of dealing rests upon the party seeking to benefit from it. *Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.,* 621 F.2d 560, 564 (3d Cir. 1980).

For example, in *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.*, a court concluded that limitation of liability terms contained in a ship repair contract were binding, even though "the written document which constitute[d] the contract for repair was not sent to the Plaintiff until some time after the repair work was completed." *Hudson Waterways Corp. v. Coastal Marine Serv., Inc.*, 436 F. Supp. 597, 604–05 (E.D. Tex. 1977). In that case, the parties had a course of dealing of 102 separate repair jobs over a 5-year period. And, in each of these jobs, a contract containing a limitation of liability clause was sent to the plaintiff after the work was completed. *Id.* at 604-05. The court thus found a limitation of liability clause was implied in "every repair contract" between the parties. *Id.* at 605.

Indeed, "courts have found a course of dealing between parties to a maritime contract based on a party's receipt of as few as three or four bills of lading containing the same . . . terms, and upon a party's approval of only nine invoices containing identical . . . clauses." *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d at 266 (first citing *Royal Ins. Co. v. Sea–Land Serv. Inc.,* 50 F.3d 723, 727 (9th Cir. 1995); then citing *Lykes Bros. S.S. Co. v. Waukesha Bearings Corp.,* 502 F. Supp. 1163, 1172–73 (E.D. La. 1980)). On the other hand, a single prior transaction has been held insufficient to constitute a course of dealing. *Offshore Specialty Fabricators, LLC v. Dumas Int'l, Inc.*, 982 F. Supp. 2d 695, 706 (E.D. La. 2013).

When evidence establishes a course of dealing in which a written contract follows an oral argument, an offeree's silence in response to a written contract "may be reasonably interpreted as assent to the terms and conditions." *In Complaint of Moran Philadelphia*, 175 F. Supp. 3d 508, 522 (E.D. Pa. 2016); *see also Celtic Marine Corp. v. Basin Com., Inc.*, No. 18-8370, 2019 WL

3253966 (E.D. La. July 19, 2019) (holding that the terms contained in a written instrument drafted subsequent to an oral agreement were "enforceable in the absence of both parties' signatures because Defendant had reasonable notice of the terms at issue given their inclusion in [a prior contract] and manifested assent to those terms by failing to object to any provisions in the contract and continuing to communicate with Plaintiff about the barges"); *Sea–Land Serv., Inc. v. Landis*, No. Civ. A. 94–6153, 1996 WL 4120, *3 n. 8 (E.D. Pa. Jan 3, 1996) (citing the Restatement (Second) of Contracts for the rule that an "offeree's silence or inaction is valid acceptance of a contract where because of previous dealings or otherwise, it is reasonable that the offeree should notify the offeror if he does not intend to accept").

Here, there is clear evidence that, at least initially, the parties struck an oral agreement. In Ponchartrain's corporate deposition, its operations manager, Matt Booker, testified that "there[ wa]s not a charter agreement" for the GRANT at the time it was chartered in February 2020; rather, "it was a handshake deal." R. Doc. 65-2 at 3. The oral contract, Booker stated, "was a bareboat charter." *Id.* at 7.[5] Under its terms, Shallow Water would invoice Ponchartrain at the agreed-upon rate of $550/day, and Ponchartrain paid that amount. *Id.* at 7.

In September 2020, more than seven months after the oral contract was formed, Ponchartrain received the written charter from Shallow Water. *Id.* at 4. But they "never signed it." *Id.* at 7. Thus, as Ponchartrain's representative testified, the company was "probably just still working under the oral" agreement, even after it received the written charter party. *Id.*

---

[5] A "bareboat" or "demise" charter agreement is characterized by a "complete transfer of possession, command, and navigation of the vessel from owner to the charter." *Gaspard v. Diamond M. Drilling Co.,* 593 F.2d 605, 606 (5th Cir.1979). The vessel is chartered without equipment or a crew. *See Winn v. C.I.R,* 595 F .2d 1060, 1062 (5th Cir. 1979).

Notwithstanding this testimony, Ponchartrain argues that the parties' course of dealing manifests an understanding that the oral agreement would be followed by the charter party whose terms control. R. Doc. 64 at 2-4.[6] Ponchartrain points to testimony from Booker, its corporate designee, who stated that Ponchartrain did not "charter" the barge but instead "order[ed]" it. R. Doc. 77 at 4. Booker distinguished the two methods of arranging for the lease of a vessel, stating that: "Typically when you order, it's just like when you order a piece of rental equipment. You can call in and order it. And then you need to follow up with, you know, the charter agreement." Booker said that when he was looking to rent a vessel, he would call a vessel charterer and ask for a quote on the vessel he sought. Usually, "at that time they will send me their terms and they'll send me their quote sheet, and I will have to sign their charter agreement." *Id.* In his experience, other than the "ordering" of the GRANT, Booker had never rented a barge or marine equipment "without having some kind of quote or some kind of charter agreement." *Id.*

Booker also provided some testimony on business transactions between Ponchartrain and Shallow Water. He stated that, in addition to the GRANT, Ponchartrain chartered two other barges from Shallow Water: the MISSY and the H. GRAHAM BROWN. Booker did not, however, specify when these other charters occurred.

In his testimony, Booker noted that the MISSY was chartered pursuant to a written contract. *Id.* at 5. The agreement to charter the H. GRAHAM BROWN, meanwhile, was reached in the same manner as the GRANT—over a handshake. *Id.* at 3. But unlike the GRANT, Ponchartrain "got a [written] charter agreement from day one." *Id.* at 5.

---

[6] Although Ponchartrain argues that there was an existing course of dealing between the parties, the company does not specifically argue that any industry-wide custom permitted written contracts to follow oral agreement, nor does it cite any caselaw that would support engrafting the terms of an unexecuted written charter onto an oral agreement based on maritime custom alone.

The Court finds that this testimony is minimally sufficient to create a fact issue on whether there was a course of dealings between the parties in which a subsequently-filed written agreement was permitted to supplement the terms of an oral agreement. First, Booker's testimony evidences that Ponchartrain's normal course of business was to place a verbal order for a barge, with a written agreement to follow. Moreover, there is some evidence of other transactions between the parties in which an oral agreement was followed by a written charter. Although Ponchartrain's own corporate representative stated that the parties were "probably just still working under the oral" agreement even after the written agreement was sent, R. Doc. 65-2 at 7, this statement is not dispositive of the issue. Rather, the court concludes that there is sufficient evidence for a reasonable juror to find that there was a "course of dealing between the parties" that existed prior to the subchartering of the GRANT. *One Beacon Ins. Co.*, 648 F.3d at 265; *see also Kunststoffwerk Alfred Huber,* 621 F.2d at 564. Thus, it must be for the factfinder to determine whether the terms of the oral agreement alone govern or if they were supplemented by the subsequent written charter.

Although there is a genuine dispute of fact as to the terms of the parties' charter contract, Shallow Water may still be entitled to summary judgment if its interpretation of the contract's terms is correct, regardless of whether it is the oral or written terms that apply. Stated differently, if Shallow Water's arguments—*i.e*, that (1) it has no liability for consequential damages and (2) rent stopped accruing on January 10, 2021—are meritorious under *both* the oral and purported written terms of the charter, then it may still prevail at summary judgment. The Court thus considers whether Shallow Water's arguments hold up when applied against both the oral and written terms.

**2.  The Terms of the Oral and Purported Written Charter**

i.      **Lost Charter Hire**

The Court first considers whether Ponchartrain has liability for lost charter hire under the terms of the oral contract. Ponchartrain's own corporate representative, as mentioned, expressly testified that the agreement "was a bareboat charter" and the parties agreed upon a rate of $550/day for the barge. R. Doc. 65-2 at 7. Moreover, under a bareboat charter, the charterer's "'basic obligation [is] to pay the charter hire stipulated' . . . and to return the vessel to the owner 'in the same condition as received excepting ordinary wear and tear." *M/V EDITH PEARL, L.L.C. v. St. John Fleeting, Inc.,* No. Civ.A. 12-2962, 2014 WL 2520132, at *3 (E.D. La. June 4, 2014) (quoting 2 Thomas J. Schoenbaum, *Admiralty & Mar. Law* [hereinafter "Schoenbaum on Admiralty"] § 11-3 (5th ed. 2012)). Importantly, a bareboat "charterer has liability for any and all casualties resulting from . . . operation" of the vessel. *Walker v. Braus*, 995 F.2d 77, 81 (5th Cir. 1993). This liability includes lost charter hire. Schoenbaum on Admiralty § 14:7 (6th ed.) (citing *Bouchard Transp. Co. v. Tug Ocean Prince*, 691 F.2d 609 (2d Cir. 1982)); *see also* LeRoy Lambert*, Damages Arising from Breach of Contract, Loss of Revenue, and "Indirect" Damages*, 72 Tul. L. Rev. 759, 763–64 & n.18 (1997).[7] Notably, Ponchartrain does not dispute

---

[7] The parties refer to liability for lost charter hire or rent as being in the nature of consequential damages. In at least one case, however, the Fifth Circuit has held that a somewhat similar type of damages—namely, the additional cost of hiring a replacement for an unseaworthy vessel—constituted direct, not consequential, damages. *See Jab Energy Sols. II, L.L.C. v. Servicio Marina Superior, L.L.C.*, 640 F. App'x 373, 378 (5th Cir. 2016) ("'General or direct damages are damages that are recoverable for injuries that are the natural result of the breach' or 'losses that an ordinary person would expect to follow the breach.' By contrast, consequential or special damages are losses 'suffered as a "consequence" of the breach of duty, but not as a direct and immediate and foreseeable consequence.' SMS's argument fails because the damages awarded are not consequential damages. The damages awarded represent the costs of hiring a tug to replace the unseaworthy and inadequate Atlas. They stem from the direct, immediate and foreseeable consequence of the Atlas being unable to perform the voyage." (quoting 11 Joseph M. Perillo, Corbin on Contracts § 56.6 (2005) (cleaned up)); *but see* Lambert, *Damages Arising from Breach of Contract, Loss of Revenue, and "Indirect" Damages*, 72 Tul. L. Rev. 759 (1997) (collecting cases and referring to damages for loss of revenue in the maritime context as constituting "indirect" damages).

For the sake of consistency with the parties' briefing and because the nomenclature used to describe the damages at issue ultimately does not make any substantive difference, the Court will refer to Plaintiffs' lost charter hire as a form of consequential damages.

this understanding of the terms of a bareboat charter.[8] Thus, assuming the parties' agreement is controlled by the terms of the oral bareboat charter, Ponchartrain's liability extends to lost charter hire resulting from the vessel being returned in a damaged condition. The Court must therefore deny Ponchartrain's request for a summary judgment holding that it is not liable for consequential damages because Ponchartrain cannot show that it is shielded from liability for such damages under the terms of *both* the oral and written agreement.

Furthermore, the Court notes that it has already explained that the terms of the written charter do not preclude consequential damages. *See* R. Doc. 78 at 18 (Transcript of Motion Hearing, Apr. 6, 2022). Ponchartrain, however, recycles the same argument it pressed in its prior motion for summary judgment, arguing that the written agreement bars such damages. As in its previous motion, Ponchartrain homes in on the following language in the charter agreement: "All damages must be repaired by Charter. If not, repair charge will be added to the rental invoice." R. Doc. 66-3 at 1. According to Ponchartrain, this language can be construed in two ways: on one reading, Ponchartrain has the choice whether to return the GRANT in a repaired state, and if it chooses to return the vessel in a damaged or unrepaired condition, then Ponchartrain is responsible only for the repair charges. Alternatively, the first sentence in the provision could be interpreted to impose on Ponchartrain an obligation to repair the vessel prior to return. But if

---

[8] As stated above, Ponchartrain does not disagree that, under the terms of an oral bareboat, the charterer is responsible for all consequential damages resulting from damage it causes to the vessel it charters. Instead, Ponchartrain takes the position that the terms of the written charter sent by Shallow Water became part of the contract through the parties' supposed course of dealing and that these written terms absolve it of any liability for consequential damages. R. Doc. 69 at 2-7. Under Ponchartrain's view, the terms of the written charter would appear not merely to "supplement" the terms of the oral agreement, *One Beacon Ins. Co.*, 648 F.3d at 265, but instead to alter or amend those terms. That is, the waiver of consequential damages that Ponchartrain maintains is contained for in the written charter does not simply add to or clarify terms already contemplated by the oral agreement; rather, the waiver directly conflicts with those terms (regardless as to whether the terms of the oral bareboat charter were express or implied). Nevertheless, it appears that, when parties do in fact have a course of dealing, the provisions of a written agreement that are part of that course of dealing may permissibly conflict with and supersede the terms of a prior oral agreement. *See* Restatement of Contracts at § 232 ("[N]or is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing.").

Ponchartrain breaches this obligation, then the next sentence supplies the damages for this breach—Ponchartrain must pay for the cost of repairs. Under either view, Ponchartrain contends, its liability is limited to paying for the cost of repairing the GRANT.

For the same reasons the Court rejected Ponchartrain's argument before, it must reject Ponchartrain's argument again. The language Ponchartrain focuses on concerns only damages for repair; it does not address any other type of damages. Specifically, the language does not deal with loss-of-use or consequential damages. Nor does any other provision of the written charter. And it is beyond dispute that waivers of damages—including for loss-of-use damages, which are implied into vessel charters, *see* Schoenbaum on Admiralty § 14:7 (6th ed.)—must be express and unambiguous. *See Jig the Third Corp. v. Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171 (5th Cir. 1975), *overruled on other grounds* by *East River Steamship Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858 (1986). It is clear, then, that Ponchartrain's argument is beside the point: in determining whether the terms of the contract waives loss-of-use damages, the construction of a provision in the contract regarding damages for the vessel being returned in a damaged condition is simply not relevant. Rather, what is salient is that the written charter nowhere discusses consequential damages. Thus, this type of damages is not waived. *See id.* Subject to the presentation of sufficient proof at trial, Ponchartrain may be liable for consequential damages under the terms of the written charter.

In sum, Ponchartrain is not entitled to summary judgment on its claim that it is immune from liability for consequential damages.

### ii.    Rent Owed by Ponchartrain

The Court now considers the issue of Ponchartrain's liability for rent. Ponchartrain argues that it is "not liable for past due rent subsequent to the Off-Charter survey conducted on

January 9-10, 2021." R. Doc. 62-1 at 7. Put another way, Ponchartrain asserts that rent stopped

accruing once the off-charter survey of the GRANT concluded on January 10, 2021. But under

either the oral charter or the written instrument, the Court finds that Ponchartrain may not be

awarded summary judgment on this issue.

Assuming that the oral bareboat charter supplies the relevant terms, the parties provide

no evidence as to what the terms were as to when rent ceases to accrue. Thus, if the oral

agreement governs the issue of rent, the Court is unable to determine at this time when new rent

stopped accruing. Under the written charter, "[r]ent will stop after off charter survey has been

completed." R. Doc. 66-3 at 1. But even so, the parties previously represented to the Court that

three separate off-charter surveys have been conducted—in January, March, and September

2021. And Plaintiffs have adduced testimony from TK's corporate representative, Todd

Kirkpatrick, suggesting that the pertinent off-charter survey has not even happened yet: the off-

charter survey of the GRANT, according to Kirkpatrick, will occur only after the repairs to the

vessel—which have not yet begun—are completed. R. Doc. 65-4 at 2.

In short, if the oral contract governs, the trier of fact must resolve what this contract's

terms are as to when new rent stops accruing. And if the written version controls and rent stops

accruing at the time of off-charter, fact issues exist as to when the relevant off-charter occurred.

Ponchartrain's request for a summary judgment determining that it does now owe any rent for

the GRANT that accrued after January 10, 2021 must be denied.

### 3. TK's Claims

Last, the Court addresses Ponchartrain's argument that TK lacks any claims against it. R.

Doc. 62-1 at 3. Ponchartrain maintains that TK has no cause of action against it because TK is

not a party to the subcharter between it and Shallow Water and because TK is not a third-party

beneficiary to the subcharter. R. Doc. 62-1 at 3-4. TK acknowledges that it is not in privity with Ponchartrain. Nevertheless, TK is correct that, at a minimum, it may have a maritime tort claim against Ponchartrain.

"The analysis of a maritime tort is guided by general principles of negligence law." *In re Signal Intern., LLC,* 579 F.3d 478, 491 (5th Cir.2009) (internal quotation and citation omitted). "Under general tort principles, a tortfeasor is accountable only to those to whom a duty is owed." *Id.* "Duty is measured by the scope of the risk that negligent conduct foreseeably entails." *Id.* (internal quotation and citation omitted). "The risk [of foreseeability] is whether the harm that does occur is within the scope of danger created by the defendant's negligent conduct." *Id.* (internal quotation and citation omitted).

Applying these principles, courts have found that a subcharterer may be liable to the owner of a vessel when the subcharterer's negligence causes damages to the owner's vessel. *E.g.*, *The C.W. Crane*, 155 F.2d 940, 943 (2d Cir. 1946) ("Since it appears that the scow was delivered in good condition, and returned in a damaged state, the charterer is liable unless it can be shown that the damage resulted despite due care on its part and on the part of the subcharterer. And where, as here, it is found that the damage occurred while the scow was in the possession of the subcharterer, the latter is primarily liable unless it can show that it has discharged its duty to exercise due care."); *see also Seaboard Sand & Gravel Corp. v. Moran Towing Corp*., 154 F.2d 399, 402 (2d Cir. 1946) (holding that subcharterer of a vessel was liable to vessel owner for damages sustained by vessel where subcharterer entrusted vessel to another company, which loaded the vessel in manner that caused it to capsize; subcharterer was "secondarily liable for the negligence of" the party to whom it entrusted the vessel). Thus, based on the record, the Court cannot say that TK, as owner of the GRANT, has no right of action against the subcharterer,

Ponchartrain. Thus, Ponchartrain's argument for dismissing TK's claims is unavailing. Of course, TK will ultimately have to prove up its claims at trial.

### IV.     CONCLUSION

For these reasons,

**IT IS ORDERED** that Ponchartrain's motion for partial summary judgment, R. Doc. 62, is **DENIED**.

New Orleans, Louisiana, this 10th day of August, 2022.

**UNITED STATES DISTRICT JUDGE**