**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| **SHALLOW WATER EQUIPMENT L.L.C. ET AL** | **CIVIL ACTION** |
| **VERSUS** | **NO. 21-949** |
| **PONTCHARTRAIN PARTNERS, L.L.C.** | **SECTION "L" (4)** |

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

This suit arises out of the charter and subcharter of the spud barge GRANT. TK Boat Rentals, L.L.C. ("TK Boat"), the owner of the GRANT, chartered the vessel to Shallow Water Equipment L.L.C ("Shallow Water"), which, in turn, subchartered the vessel to Pontchartrain Partners, LLC ("Pontchartrain"). The vessel allegedly sustained damages due to improper use by Pontchartrain. TK Boat and Shallow Water seek damages for unpaid charter hire and consequential damages resulting from Ponchartrain's failure to return the GRANT in her original condition. Defendants, Pontchartrain and Continental Casualty Company ("Continental"), generally deny liability and assert various affirmative defenses, including among others prescription, statute of limitations, and laches.

This case came on for trial before the Court without a jury on August 22, 2022. The Court has carefully considered the testimony of all witnesses, the exhibits entered into evidence during trial, and the relevant entries in the record. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, the Court hereby enters the following findings of fact and conclusions of law.

To the extent that any findings of fact may be construed as conclusions of law, the Court adopts them as such, and to the extent that any conclusions of law constitute finding of facts, the Court adopts them as such.

I.    **FINDINGS OF FACT**

1.    Plaintiff TK Boat is a limited liability company with two members, both of whom are Louisiana domiciliaries.

2.    Plaintiff Shallow Water is a Louisiana limited liability company with two members, both of whom are Louisiana domiciliaries.

3.    Defendant Pontchartrain is a Louisiana limited liability company with four members, all of whom are Louisiana domiciliaries.

4.    Defendant Continental is wholly owned by The Continental Corporation. The Continental Corporation is wholly owned by CNA Financial Corporation and has issued shares to the public. Lowes Corporation owns the majority of the stock of CNA Financial Corporation and is publicly traded.

5.    At all relevant times, TK Boat owned the GRANT. The GRANT is a 140 x 40 keyway barge. It was constructed in 2010 and was built to ABS (American Bureau of Shipping) specifications, but not ABS classed.  *Testimony of Todd Kirkpatrick and James Bailey*.

6.    The GRANT's ordinary work, as a keyway barge, is to provide access to oil wells in near-coastal waters.  *Testimony of Todd Kirkpatrick and Keith Kraemer*.

7.      The GRANT can and does also work as a spud barge, which provides a work platform for construction equipment.  *Testimony of Todd Kirkpatrick and Keith Kraemer.*


8.      On or about February 2020, TK Boat orally bareboat-chartered the GRANT to Shallow Water.  *Testimony of Todd Kirkpatrick and Keith Kraemer.*


9.      On February 24, 2020, the GRANT was the subject of an on-hire survey, which was performed by James Bailey, a third-party credentialed marine surveyor with the company NVI. This survey confirmed that the barge was undamaged, seaworthy, and capable of performing the purpose of the charter.  *Testimony of Todd Kirkpatrick and Keith Kraemer.*


10.     The charter agreement between TK Boat and Shallow Water obligated Shallow Water to pay rent at the rate of $400 per day and to return the GRANT in the condition she was in at the inception of the charter.


11.     On February 24, 2020, Shallow Water subchartered the GRANT to Pontchartrain by means of an oral bareboat charter. In September 2020, Shallow Water drafted and sent to Pontchartrain a signed written charter, which was received and placed in Pontchartrain's files and never signed by Pontchartrain.  *Testimony of Matt Booker and Keith Kraemer; corporate deposition of Pontchartrain at 40:24-18.*


12.     The GRANT was one of several barges that Pontchartrain had chartered from Shallow Water around that time but was the only barge that was a subcharter. On or about January 23,

2020, approximately one month before subchartering the GRANT, Pontchartrain chartered the H GRAHAM BROWN. Subsequently, on or about September 30, 2020, Pontchartrain chartered the MITZI L. *Testimony of Matt Booker and Keith Kraemer*.

13.     The course of dealings between Shallow Water and Pontchartrain allowed Pontchartrain initially to orally charter a vessel and to have Shallow Water subsequently memorialize those terms in a written Charter Agreement.[1] This procedure was followed in the charter of the H GRAHAM BROWN, which preceded the subcharter of the GRANT. *See Celtic Marine Corp. v. Basin Com., Inc*., No. CV 18-8370, 2019 WL 3253966, at *4 (E.D. La. July 19, 2019) (finding that a written contract "was enforceable in the absence of both parties' signatures because Defendant had reasonable notice of the terms at issue given their inclusion in [a single prior contract] and manifested assent to those terms by failing to object to any provisions in the contract and continuing to communicate with Plaintiff about the barges); *Matter of Adriatic Marine, LLC*, No. CV 20-1488, 2021 WL 5833968, at *3 (E.D. La. Dec. 9, 2021) ("Therefore, the holding from . . . *Celtic Marine* is that terms and conditions contained in subsequently issued contracts may supplement or continue existing contracts if there is evidence of a prior course of dealing between the parties from which a court may infer that the parties were aware of and consented to those additional contractual terms." (internal quotation marks omitted)). Moreover, Keith Kraemer testified at trial that the terms of the written contract and oral agreement were the same.

---

[1] The burden of establishing a course of dealing rests upon the party seeking to benefit from it. *Kunststoffwerk Alfred Huber v. R.J. Dick, Inc.,* 621 F.2d 560, 564 (3d Cir. 1980).

14.     The written Charter Agreement required Pontchartrain to pay rent to Shallow Water at the rate of $475 per day and provided that "[r]ent will stop after off-charter survey has been completed." The contract further reads: "All damages must be repaired by Charterer. If not, repair charges will be added to the rental invoice." *Exhibit 1*.

15.     The testimony at trial of Keith Kraemer, an owner of Shallow Water, confirmed that the written Charter Agreement governed the actions between Pontchartrain and Shallow Water.

16.     During its subcharter, Pontchartrain first took the GRANT to Chocolate Bayou, Texas, where it was engaged in work until about September 2020.  *Testimony of Matt Booker*.

17.     Over the course of the Chocolate Bayou job, Pontchartrain used an excavator on the barge without mats.  *Testimony of Matt Booker; Trial deposition of Travis Glass 5/12-8:4.*

18.     Crane mats are used for two reasons: they enhance safety on the barge, and they also distribute the weight of equipment on the barge, ensuring the barge is not damaged. Todd Kirkpatrick, a member of TK Boat, testified at trial that mats are always used on a spud barge when an excavator is working on the vessel. If mats are not used, beams may cave in, compromising the vessel's integrity and rendering it unseaworthy. *Testimony of James Bailey, James Stansbury, Todd Kirkpatrick, and Matt Booker*.

19.     Ponchartrain's decision not to use mats while the excavator was on the barge was made in spite of requests from its workers serving aboard the vessel who communicated to the

company's management the need for crane or "swamp" mats. As a result of Ponchartrain's

failure to use mats, the GRANT sustained damages. *Trial deposition of Travis Glass.*

20.     The damage at Chocolate Bayou was mostly to the supporting structure of the deck of the

barge. While not clearly detectible from a cursory inspection on the deck of the vessel, the

damage was clearly visible from a more thorough inspection below deck. *Testimony of Matt*

*Booker; trial deposition of Travis Glass; Exhibit 5 at 6.*

21.     Pontchartrain's work in Chocolate Bayou, referenced above, was bonded, pursuant to the

Miller Act, 40 U.S.C. §§ 3131 *et seq*, by performance bond No. 30083299, OMB Control

Number 9000-0045, dated October 1, 2019 and issued by Continental. *Trial Exhibits 16 and 17.*

That bond secured Contract Number W912HY19C0027, which only covered work performed at

Chocolate Bayou.  Pontchartrain's work on that contract ended in early September 2020, and the

GRANT ended its work on that contract in September 2020 as well. Over one year later, namely

on December 1, 2021, Continental was added to this lawsuit.  *Testimony of Matt Booker.*

22.     Later in September 2020, after completing its work on the Chocolate Bayou job, the

GRANT returned to Pontchartrain's yard. At that time, Pontchartrain called Shallow Water

asking it to replace a spud cable.  *Testimony of Matt Booker and Keith Kraemer; trial deposition*

*of Brent Boudreaux 5:18-7:24.*

23.     Kraemer, a principal of Shallow Water, and Brent Boudreaux, who works for TK Boat, visited the barge. Despite the damage, neither saw anything wrong with the barge. *Testimony of Keith Kraemer; trial deposition of Brent Boudreaux 5:18-7:24*.

24.     Also in September 2020, Pontchartrain realized that it had made an administrative oversight by failing to provide hull insurance for the GRANT. Ponchartrain thus added the GRANT to its hull insurance policy, which was issued by Great American Insurance Co. ("Great American"). That addition was effective September 9, 2020. *Testimony of Matt Booker.*

25.     Still under its bareboat charter to Ponchartrain, the GRANT proceeded to Vicksburg, Mississippi to work on another job. The GRANT continued working in Vicksburg with an excavator on it without mats and sustained additional damages. This time the damage was also to the topside of the deck of the barge. *Testimony of Matt Booker.*

26.     In January 2021, the GRANT returned to Pontchartrain's yard. *Testimony of Matt Booker, Keith Kraemer, Todd Kirkpatrick, and James Bailey.*

27.     On January 9, 2021, James Bailey of NVI surveyed the GRANT. It is undisputed that, by January 9, 2021, there was significant damage to the barge, which was clearly visible from the deck. Bailey's off-charter survey concluded on January 10, 2021. *Testimony of Todd Kirkpatrick and James Bailey*; s*tipulation*.

28.     On or about February 2, 2021, the GRANT was still at Pontchartrain's yard, and, at the request of Pontchartrain, the Shearer Group surveyed the barge because Ponchartrain disputed the projected costs of repair contained in the prior off-charter survey by James Bailey. Later in February 2021, the GRANT was surveyed jointly by James Bailey and Jim Quackenbos with Qubed. Quackenbos was appointed by Great American, the vessel's hull insurer, and by Pontchartrain. The parties disagreed significantly about the scope of damages. *Testimony of James Bailey and Matt Booker*.

29.     Starting in January 2021 and continuing until September 2021, Shallow Water stopped invoicing Ponchartrain for the full charter hire of $475 per day, reducing the fee to between $200 per day to a total of $435 per day. Shallow Water's representative testified that the company took this step in an effort to induce Ponchartrain to repair the barge. *Exhibit A (invoices)*; *Testimony of Keith Kraemer*.

30.     The *GRANT was finally returned from Ponchartrain's yard to TK Boat on July 2, 2021. *Testimony of Todd Kirkpatrick*.

31.     On September 14, 2021, a joint survey of the GRANT was performed by James Bailey, on behalf of TK Boat and Shallow Water, and James Stansbury, on behalf of Ponchartrain and Great American. The two surveyors met and agreed to specified damages and repairs, and the parties accepted the joint survey's conclusions as controlling. The dollar value of the repairs contemplated by the joint survey was in-between the costs of repairs that Shallow Water's and

Ponchartrain's respective surveyors had recommended in their earlier off-charter surveys. *Testimony of James Bailey and James Stansbury.*

32.    TK Boat did not immediately repair the GRANT because TK Boat only carried liability insurance on the GRANT, and because TK Boat did not have adequate assets available to pay for these specified damages.   *Testimony of James Bailey and James Stansbury.*

33.    The parties have now settled their property damage claim, and by that settlement, the GRANT will be repaired at Intercoastal Marine Repairs on November 25, 2022. The repair is estimated to take 30-35 working days, and therefore the Court finds that repairs will end on January 6, 2023. These repairs have been compromised and are not a part of this trial. *Stipulation; Testimony of James Bailey and James Stansbury.*[2]

34.    In the meantime, while awaiting repairs, TK Boat chartered the barge for $550 per day. TK Boat was able to receive this rate due to the increased demand for barges following Hurricane Ida. The GRANT has remained on-charter for $550 per day from October 19, 2021 to the present. *Testimony of Todd Kirkpatrick.*

35.    Based on unrebutted testimony, the Court finds that the going market rate for a keyway barge like the GRANT increased after Hurricane Ida because of the necessity of using barges for

---

[2] After Plaintiffs represented in their proposed Findings of Fact and Conclusions of Law that "the parties have stipulated that the joint survey [on September 14, 2021] controls," R. Doc. 81 at 4, Plaintiffs appeared to shift positions at trial, contending in testimony that a final off-charter survey will be conducted after all repairs to the barge are completed and that, in their view, this yet-to-be-performed survey will constitute the off-charter survey within the meaning of the contract between Shallow Water and Ponchartrain. *Testimony of Keith Kraemer.*

construction and hurricane repair. The evidence supports the conclusion that the going rate for

such a barge in good repair following the storm and through February 20, 2022 was $750 per

day. *Testimony of Todd Kirkpatrick*; *Plaintiffs' Proposed Findings of Fact and Conclusions of

Law* (R. Doc. 81 at 5).[3]

36.     Around the start of the invasion of Ukraine by Russian forces in February 2022, the price

of oil spiked. This caused demand for keyway barges—which are designed to work on oil

wells—to increase, which, in turn, raised their charter price. There was testimony from Todd

Kirkpatrick that since the invasion of Ukraine, the day rate to charter a spud barge like the

GRANT but in good condition is between $1,000 to $1,200 per day. James Stansbury, a marine

surveyor hired by Ponchartrain, testified that the present charter hire rate was substantially lower,

putting it at $750 per day. The Court finds that the actual charter hire rate falls in-between the

rates offered by the parties' witnesses. Specifically, the Court finds that, starting on February 21,

2022 and continuing to the present, the GRANT could have been chartered for $850 per day if it

had been returned to TK Boat in good condition. *Testimony of Todd Kirkpatrick and James

Stansbury*.

37.     The GRANT's current charter is anticipated to end at some point in mid-October. The

Court finds that current charter will end on October 15, 2022. *Testimony of Todd Kirkpatrick*.

---

[3] At trial, Todd Kirkpatrick testified that he would have received $800 per day or more for a barge like the GRANT based on the going rate for other barges; however, Plaintiffs request that the Court find that the GRANT could have earned only $750 per day in charter hire, R. Doc. 93 at 3, so the Court will adopt this lower sum as its finding.

38.     Todd Kirkpatrick testified that it was unlikely that TK Boat will be able to charter the

vessel for a "spot job" between the conclusion of its current charter in mid-October until it

undergoes repairs in November 2022. Of course, TK Boat also cannot charter the vessel while it

undergoes repairs from November 25, 2022 until January 6, 2023. Accordingly, the Court finds

that TK Boat will be unable to charter the vessel from October 15, 2022 until January 6, 2023.

*Testimony of Todd Kirkpatrick.*

39.     Shallow Water has never made a claim against its insurer to cover the cost of repairing

the GRANT. *Testimony of Keith Kraemer.*

40.     TK Boat has never demanded that Shallow Water repair the vessel nor has TK Boat

demanded that Shallow Water pay any back rent. *Testimony of Todd Kirkpatrick.*

## II.     <u>CONCLUSIONS OF LAW</u>

1.     This case arises out of a vessel charter and thus is within the Court's admiralty and

maritime jurisdiction within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure.

In addition, the Court has jurisdiction pursuant to 28 U.S.C. § 1333. Venue is proper in the

Eastern District of Louisiana.[4]

2.     The plaintiffs, TK Boat and Shallow Water, have several potential claims resulting from

the above facts.

---

[4] The parties' written agreement states that venue is only proper in Assumption Parish. Because the federal judicial district for the Eastern District of Louisiana encompasses Assumption Parish, venue lies in this district. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 881 (3d Cir. 1995); *see also Epps v. 1.I.L., Inc.,* No. 07–2314, 2007 WL 4463588, at *3 (E.D. Pa. Dec. 19, 2007). Moreover, to the extent that venue may be improper, such an objection has never been raised and is therefore forfeited. Fed. R. Civ. P. 12(b).

3.      TK Boat has a potential contract claim against Shallow Water (and Shallow Water's insurer) based on its charter of the GRANT to Shallow Water. Under the charter, Shallow Water had a duty to pay $400 a day during the period of the charter and a duty to return the GRANT to TK Boat at the end of the charter in the same condition in which she was received. TK Boat has chosen not to assert claims against Shallow Water (or its insurer).

4.      TK Boat also has a claim against Pontchartrain based on the General Maritime Law for negligently damaging its vessel, the GRANT, which it has asserted in this litigation.

5.      Shallow Water has a contract claim against Pontchartrain based on it subcharter of the GRANT to Pontchartrain, which it has asserted in this litigation.

6.      Shallow Water also has a claim against Continental based on the Miller Act, 40 U.S.C. §§ 3133 *et seq*, which it has asserted in this litigation.

The Court will consider each of these claims in turn:

**A.      TK Boat's Claim Against Ponchartrain**

7.      The analysis of a maritime tort claim is guided by general principles of negligence law. *In re Signal Intern., LLC*, 579 F.3d 478, 491 (5th Cir. 2009). Under general tort principles, a tortfeasor is accountable to those to whom a duty is owed. "Duty is measured by the scope of the risk that negligent conduct foreseeably entails." *Id.* "The risk [of foreseeability] is whether the

harm that does occur is within the scope of danger created by the defendant's negligent conduct." *Id.*

8.      A subcharterer may be liable to the owner of a vessel when the subcharterer's negligence causes damages to the owner's vessel. *See The C.W. Crane*, 155 F.2d 940, 943 (2d Cir. 1946); *see also Seaboard Sand & Gravel Corp. v. Moran Towing Corp.*, 154 F.2d 399, 402 (2d Cir. 1946). This is because harm to the owner of a vessel is within the scope of the danger created by a subcharterer who negligently damages the owner's vessel.

9.      The evidence supports the conclusion that Pontchartrain negligently damaged the GRANT by the use of an excavator on the deck of the GRANT without adequate mats. TK Boat, the owner of the GRANT, is therefore entitled to recover the damages it sustained as a result of this negligence.

10.     Ponchartrain contends that TK Boat's maritime tort claim is barred by the rule in *Robins Dry Dock & Repair v. Flint*, 275 U.S. 303 (1927). R. Doc. 94 at 4-5. As it has been developed by the Fifth Circuit, the *Robins Dry Dock* doctrine holds that "maritime tort damages for economic loss can be awarded only when the plaintiff has suffered physical damage to a proprietary interest." *Domar Ocean Transp., Ltd., Div. of Lee-Vac, Ltd. v. M/V Andrew Martin*, 754 F.2d 616, 619 (5th Cir. 1985) (citing *State of Louisiana v. M/V TESTBANK*, 752 F.2d 1019 (5th Cir. 1985) (en banc)).

11.    The Court finds that Ponchartrain's argument, though clever, is foreclosed by the Fifth

Circuit's binding precedent in *Rogers Terminal & Shipping Corp. v. International Grain*

*Transfer, Inc.*, 672 F.2d 464 (5th Cir. 1982).[5] There, a floating grain elevator was damaged as a

result of a collision with another vessel. Both the bareboat charterer and the owner of the floating

grain elevator sought damages. The bareboat charterer settled its claims before trial. *Id.* at 465.

The sole issue before the court was whether the owner was entitled to the loss of use of the

vessel, profits, and income for the repair period during which the vessel was inoperable. *Id.*

12.    As in this case, the defendant in *Rogers Terminal* argued that under the *Robins Dry Dock*

rule, the owner could not recover because it merely had a right of reversion upon the charter's

termination. *Id.* at 466. The court squarely rejected this contention, holding that "[t]he fact that

the vessel was bareboat chartered at the time of the collision is not such to establish that [the

vessel's owner] relinquished all proprietary interest and consequently could not recover." *Id.*

That *Robins Dry Dock* did not preclude the vessel owner's claim was consistent with the "well

established" rule "that the owner of a vessel has the right to recover from a tortfeasor who causes

physical damage to the vessel." *Id.* (citing Gilmore and Black, The Law of Admiralty, at 239 (2d

ed.)). Accordingly, the Fifth Circuit upheld the award of economic losses to the vessel owner. *Id.*

at 465.

---

[5] In a two-sentence per curiam, the Fifth Circuit "affirm[ed] on the basis of the appended opinion of the district court." *Rogers Terminal*, 672 F.2d at 465. Because the Fifth Circuit essentially adopted the district court's opinion, the description of the facts of the case and the court's reasoning is actually taken from the district court's opinion, which, again, was appended to the appeals court's decision.

13.     Similarly, in *Vicksburg Towing Co. v. Mississippi Marine Transport Co.*, the owner of a barge unloading facility sued for loss of rental income resulting from damage caused by a vessel that collided with its facility. 609 F.2d 176 (5th Cir. 1980). The owner of the facility had executed a lease agreement with another company that "required the lessee to assume all responsibility for repairs to the demised premises during the term of the lease." *Id.* at 177.  The lease agreement further provided that rent would be abated during any period of repairs. *Id.* The owner thus sought to recover from the defendant the amount of rent that was abated while the facility was repaired. The defendant objected, arguing that the owner could not recover its economic losses because of the *Robins Dry Dock* rule.

14.     Once again, the Fifth Circuit disagreed. The court reasoned that unlike in other cases where it had denied recovery to parties that only suffered harm to their interest in a contractual relationship, "the plaintiff here is the owner of a damaged property." *Id.* at 178. That is to say, the plaintiff had "an insurable interest" and "all of the elements of ownership which attach to a freehold interest, including the right of use, a thing of value." *Id.* The court therefore affirmed the award of lost rent to the facility's owner. *Id.*

15.     Based on these controlling precedents, the Court concludes that TK Boat has a sufficient proprietary interest to satisfy *Robins Dry Dock* and thus to maintain its maritime tort claim against Ponchartrain. *See* Philip A. Vagin, *Who Can Sue for Losses Caused by A Collision Under U.S. and English Law: Robins Dry Dock and Exceptions to It*, 45 Tul. Mar. L.J. 509, 517 (2021) ("It is clear that *a shipowner* will always retain a sufficient proprietary interest in his ship to claim economic loss for damage to it, even if the ship is bareboat-chartered.").

16.     The Court notes that, subsequent to the two decisions discussed above, the Fifth Circuit has "held that a bareboat charterer [may have] a sufficient proprietary interest in . . . damaged property to state a cause of action for its economic losses" since the bareboat charter "'stands in the shoes of the owner of the vessel for the duration of the charter and is responsible for managing and maintaining the ship.'" *Int'l Shipbreaking Ltd. LLC v. Smith*, 44 F. App'x 653 (5th Cir. 2002) (quoting *Bosnor S.A. de C.V. v. Tug L.A. Barrios*, 796 F.2d 776 (5th Cir. 1986)). That a bareboat charter (or subcharterer) may have a sufficient proprietary interest to satisfy *Robins Dry Dock* does not imply that the vessel's owner is stripped of its proprietary interest in the very vessel it owns. As a leading admiralty treatise recognizes, "[i]n the case of a demise, both the charterer and the owner may recover lost profits if proved." 2 Thomas J. Schoenbaum, *Admiralty & Mar. Law* [hereinafter "Schoenbaum on Admiralty"] § 11:12 (6th ed.)). And any suggestion that these later Fifth Circuit cases can be read to oust a vessel owner of a proprietary interest in its vessel when the owner bareboat charters its ship flies in the face of the Fifth Circuit's rule of orderliness. *Vaughan v. Anderson Reg'l Med. Ctr.*, 849 F.3d 588, 591 (5th Cir. 2017) ("This Court adheres to a rule of orderliness under which a panel may not overturn a controlling precedent absent an intervening change in law, such as by a statutory amendment, or the Supreme Court, or our en banc court." (internal quotation marks omitted)).

17.     The Court thus rejects Ponchartrain's contention that it owned no duty to TK Boat but merely owed a contractual duty to Shallow Water to repair the vessel or pay for any such repairs. Regardless of Ponchartrain's knowledge that TK Boat was the GRANT's owner and therefore its appreciation that TK Boat specifically would be harmed by its conduct, it was eminently foreseeable to Ponchartrain that its tortious conduct would injure the owner of the vessel. In

short, TK Boat may recover damages from Ponchartrain as a result of Ponchartrain's negligence. *See The C.W. Crane*, 155 F.2d at 943.

**TK Boat's Damages**[6]

18.     The Court next addresses TK Boat's damages. TK Boat is entitled to recover from Ponchartrain the lost charter hire it sustained as a result of Ponchartrain's negligence in damaging the GRANT. *See Domar Ocean Transp., Ltd.*, 754 F.2d at 619; *see also Marine Transp. Lines, Inc. v. M/V Tako Invader*, 37 F.3d 1138, 1140 (5th Cir. 1994); Schoenbaum on Admiralty § 14:7.


19.     The amount of a party's damages must be proved by competent evidence with "reasonable certainty" and must not be based on evidence that is "speculative, uncertain, contingent, or hypothetical." *Blase Indus. Corp. v. Anorad Corp.*, 442 F.3d 235, 238 (5th Cir. 2006).


20.     TK Boat is also under a duty to mitigate its damages. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 592 (5th Cir. 1986). "The burden rests with the wrongdoer to show that the victim of tortious conduct failed to mitigate damages" by demonstrating "(1) that the injured party's conduct after the accident was unreasonable and (2) that the unreasonable conduct had the consequence of aggravating the harm." *Id.* If a plaintiff follows a course of action that "was reasonable, the plaintiff can recover despite the existence of another reasonable course of action

---

[6] The Court notes that its determination of damages constitutes a finding of fact. *Marathon Pipe Line Co. v. M/V Sea Level II*, 806 F.2d 585, 592 (5th Cir. 1986) (citing *Gele v. Wilson,* 616 F.2d 146 (5th Cir. 1980)).

that would have avoided further damage." *Fed. Ins. Co. v. Sabine Towing & Transp. Co.*, 783 F.2d 347, 350–51 (2d Cir. 1986).

21.     Starting on July 3, 2021, TK Boat's charter with Shallow Water effectively terminated as TK Boat began exercising complete control over the vessel. Accordingly, TK Boat's damages for lost charter hire began to accrue on July 3, 2021.

22.     From July 3, 2021 until the joint survey on September 14, 2021, the parties remained in a good-faith dispute over the scope of the damages to the GRANT. For two reasons, the Court finds that TK Boat acted reasonably in not chartering the vessel during this 74-day period. First, because the parties had a legitimate dispute over the damages, TK Boat did not know the true nature and extent of the damages the GRANT incurred. Thus, TK Boat could not know whether the GRANT was seaworthy and reasonably fit to safely perform any particular work for which a third party might seek to charter the vessel. In this situation, then, TK Boat could not prudently charter the vessel to a third party.

23.     Second, TK Boat was justified in not chartering the vessel because doing so may well have prevented the parties from arriving at an agreement as to the scope of damages that the GRANT sustained during its subcharter to Ponchartrain. That is because any chartering of the vessel by TK Boat could have resulted in additional damages to the GRANT. And if such damage had occurred, it would have made it significantly more difficult—if not impossible—for the parties to this action to agree to the damages that the GRANT sustained during Ponchartrain's subcharter. Thus, TK Boat's decision not to hire out the GRANT during the

period of time in which damages were disputed enabled the parties to resolve the property

damage issue. In short, during this time period, TK Boat did not fail to mitigate its damages.

24.     The Court calculates TK Boat's damages for lost charter hire during this 74-day period

based on the rate at which it hired the GRANT to Shallow Water, which was $400 per day. Thus,

TK Boat sustained $29,600 in damages during this period.

25.     The Court comes to a different conclusion as to TK Boat's damages from September 15,

2021 to October 18, 2021. There is no record evidence that TK Boat made any effort to charter

the GRANT during this time period. As a result, the Court finds that TK Boat failed to undertake

reasonable measures to mitigate its damages and therefore cannot recover lost charter hire during

this timeframe.

26.     Starting on October 19, 2021, TK Boat chartered the GRANT at a rate of $550, thus

mitigating its damages. As noted, the evidence shows that had the GRANT been returned in an

undamaged state, it could have been hired out at $750 per day from October 19, 2021 through

February 20, 2022. Therefore, TK Boat's damages equal the difference of $750/day and

$550/day, or $200/day during this 125-day period. Thus, TK Boat's overall damages for this

period are $25,000.

27.     From February 21, 2022 through October 15, 2022, the GRANT, had it been returned by

Ponchartrain in the same condition that it was in at the start of its subcharter, could have been

chartered out at $850/day given the increased demand for keyway barges. Accordingly, TK

Boat's damages equal $350/day for this 237-day period. This sums to $82,950 in damages for this period.

28.     From October 16, 2022 until when repairs on the GRANT are complete, which the Court estimates will occur on January 6, 2023, TK Boat will be unable to charter the vessel. This is an 83-day period; however, TK Boat requests damages for only 78 days for the period covering the end of the current charter until the end of the GRANT's repairs. The Court thus will use TK Boat's 78-day time period to calculate damages. During this time, if the GRANT were in service and in good condition, it could be chartered at $850/day. Because TK Boat cannot reasonably reduce its damages during this time, it is entitled to $850/day for this entire 78-day period. TK Boat's total damages for this time period are thus $66,300. TK Boat does not have any damages after January 6, 2023.

29.     In total, TK Boat's consequential damages attributable to Ponchartrain are $203,850.

30.     Ponchartrain argues that TK Boat failed to mitigate its damages because TK Boat could have (1) demanded that Shallow Water fulfill its duties under Plaintiffs' bareboat charter and return the GRANT in a repaired condition, and (2) made a claim against Shallow Water's insurer to cover the cost of repairs. R. Doc. 83 at 2-3. Neither argument is persuasive.

31.     Regarding Ponchartrain's first argument, the Court finds that it is speculative whether Ponchartrain's suggested method of mitigating damages would have actually reduced TK Boat's damages. Stated differently, there is insufficient evidence to show that TK Boat acted

unreasonably by not demanding that Shallow Water return the GRANT in the same condition in

which it was chartered. Even if TK Boat had done so and even if it had pursued litigation against

Shallow Water, it is not certain that the GRANT would have been repaired more quickly, and

thus the Court cannot say that TK Boat could have chartered the vessel at a higher rate at an

earlier date, thereby reducing its damages. Furthermore, even if the Court thought that TK Boat

could have mitigated its damages to an even greater extent if it had followed the course urged by

Ponchartrain, all that is required of TK Boat is that it act reasonably to avoid damage. *See Fed.*

*Ins. Co.*, 783 F.2d at 350–51 ("Therefore, the question in the present case is not whether Oaks

chose the path most likely to prevent further damage to the cargo, but whether his decision to

continue loading was reasonable under the circumstances."). And, as discussed, the Court finds

that TK Boat made a reasonable decision to charter the GRANT after the joint survey in

September 2021. Last, the Court is not aware of any authority that has adopted the approach

Ponchartrain espouses, *i.e.*, imposing a duty on a plaintiff injured by a tortfeasor to sue a third

party with which it has contractual privity in order to mitigate damages caused by the tortfeasor.

Such a holding would be odd indeed as it would enable the wrongdoer to escape liability for the

full brunt of its misconduct and shift that liability instead on an innocent third party.

Accordingly, the Court rejects Ponchartrain's first contention as to why TK Boat purportedly

failed to mitigate its damages.


32.     Because Ponchartrain's first argument that TK Boat did not mitigate its damages fails, the

Court finds that its second argument—which is an even greater stretch than its first—is also

unavailing. Ponchartrain makes the somewhat convoluted contention that TK Boat failed to

mitigate its damages because it could have sued not only Ponchartrain but also Ponchartrain's

insurer, and the failure to sue the insurer amounts to a failure to mitigate damages. In essence, Ponchartrain seeks a rule that a party harmed by a tortfeasor fails to mitigate its damages when that injured party chooses not to make a claim against a third-party's insurer that may also be liable to it. Perhaps unsurprisingly, Ponchartrain cites no authority for this proposition, nor has the Court located any authority suggesting, let alone holding, as much.

33.     More importantly, the Court finds that the policies behind the collateral source rule sinks Ponchartrain's argument. That rule is a generally recognized principle of tort law that "bars a tortfeasor from reducing the damages it owes to a plaintiff 'by the amount of recovery the plaintiff receives from other sources of compensation that are independent of (or collateral to) the tortfeasor.'" *Johnson v. Cenac Towing, Inc.*, 544 F.3d 296, 304 (5th Cir. 2008) (quoting *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1243 (5th Cir. 1994)). The rule is justified, in part, on the theory that a tortfeasor should not avoid liability for the consequences of its misconduct merely because a plaintiff had the foresight or good fortune to have another source of funds available to cover its damages. *Davis v. Odeco, Inc.*, 18 F.3d 1237, 1244 n.21 (5th Cir. 1994). Although the rule is often invoked in situations where a plaintiff has obtained insurance, it also applies where, as here, a third party (in this case, Shallow Water) purchases an insurance policy. Restatement (Second) of Torts § 920A (1979). Thus, any compensation TK Boat could have received from Shallow Water's insurer would be "independent of" damages owed by Ponchartrain. *Johnson*, 544 F.3d at 304. Accordingly, even if TK Boat had received compensation from Shallow Water's insurer, that compensation would not reduce Ponchartrain's liability to TK Boat. It follows, then, that TK Boat's decision not to seek compensation from Shallow Water's insurer

does not constitute a failure on the part of TK Boat to mitigate its damages and therefore does not relieve Ponchartrain of any liability for damages.

34.     Having determined that TK Boat is owed $203,850 in damages from Ponchartrain, the Court turns to Shallow Water's claims.

**B.     Shallow Water's Breach of Contract Claim Against Ponchartrain**

35.     Shallow Water asserts a breach of contract claim against Ponchartrain. The first issue for the Court is to determine the terms of the contract. Ponchartrain argues that the terms in the written contract govern while Plaintiffs take the position that only the terms of the oral bareboat charter apply.

36.     Under admiralty law, "oral contracts are generally regarded as valid." *Kossick v. United Fruit Co.*, 365 U.S. 731, 734 (1961). But the terms of an oral agreement may be supplemented by provisions in a subsequently-issued written agreement. *One Beacon Ins. Co. v. Crowley Marine Servs., Inc.*, 648 F.3d 258, 265 (5th Cir. 2011). This supplementation by a later writing is permissible where a prior course of dealing between the parties establishes that they "were aware of and consented to those additional contractual terms." *Id.* (first citing Restatement (Second) of Contracts [hereinafter "Restatement of Contracts"] § 223(1) (1981) (defining "course of dealing" as "a sequence of previous conduct between the parties to an agreement which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct"); then citing Restatement of Contracts § 223(2) ("Unless otherwise agreed, a

course of dealing between the parties gives meaning to or supplements or qualifies their

agreement.")).[7]

37.     Due to the parties' course of dealing, the terms of the parties' written charter, to the

extent these terms supplemented the terms in the parties' oral charter, were integrated into the

parties' agreement from the inception of the charter. *In Complaint of Moran Philadelphia*, 175 F.

Supp. 3d 508, 518 (E.D. Pa. 2016); *see also Capitol Converting Equip. v. LEP Transp.*, 750 F.

Supp. 862, 866 (N.D. Ill. 1990).

38.     The Court concludes that the following sentence in the parties' written agreement is

ambiguous: "Rent will stop after off-charter survey has been completed." Because multiple off-

charter surveys of the GRANT were conducted, the phrase "off-charter survey" could be

interpreted in several equally reasonable ways under the facts of this case. First, the "off-charter"

survey could be deemed to have occurred on January 10, 2021 when James Bailey inspected the

GRANT. Second, the off-charter survey could be the joint survey undertaken on September 14,

2021, which the parties have agreed constitutes the full scope of the damages to the barge. Last,

the pertinent off-charter survey could be, as Plaintiffs asserted at trial, a final off-charter survey

that will only be performed once all repairs to the barge are completed.

39.     "The traditional rule of construction, applied in admiralty cases, is to construe

contract language most strongly against its drafter." *Navieros Oceanikos, S. A., Liberian Vessel*

---

[7] Federal maritime law incorporates general principles of contract construction, which "can be found in treatises or restatements of the law." *Int'l Marine, L.L.C. v. FDT, L.L.C.*, 619 F. App'x 342, 349 (5th Cir. 2015) (internal quotations marks omitted).

*Trade Daring v. S. T. Mobil Trader,* 554 F.2d 43, 47 (2d Cir. 1977) (cleaned up); *accord Zapata Marine Serv., Inc. v. O/Y Finn Lines, Ltd.*, 571 F.2d 208, 209 (5th Cir. 1978). Because Shallow Water drafted the contract, the Court shall construe the instrument against Shallow Water and give it the construction that Ponchartrain seeks. The Court thus finds that the off-charter survey ended on January 10, 2021. On this date, then, Ponchartrain ceased accruing any rent obligation. And because Ponchartrain has paid in full all invoices from Shallow Water for rent on the GRANT through January 10, 2021, Ponchartain has no remaining rent obligation.

40.     Although Ponchartrain stopped accruing any new rent obligation for the GRANT on January 10, 2021, it remained in possession and control of the vessel through July 2, 2021. By exercising complete dominion over the vessel during this period, Ponchartrain effectively extended its bareboat subcharter. Put another way, from January 10, 2021 to July 2, 2021, Ponchartrain deprived Shallow Water of the ability to profit from the vessel—either by using or subchartering the GRANT. Consequently, Shallow Water is entitled to damages for loss of use. *See Domar Ocean Transp., Ltd.*, 754 F.2d at 619; *see also* Schoenbaum on Admiralty § 14:7.

**Shallow Water's Damages**

41.     The Court finds that Shallow Water is entitled to damages in the amount that it invoiced Ponchartrain from January 10, 2021 to July 2, 2021, less the amount of charter hire that Ponchartrain paid during this timeframe. The invoices reflect the sums that Shallow Water expected to receive from Ponchartrain for the vessel during this period, and thus are a fair and accurate measure of the value of Shallow Water's lost charter hire. Per the parties' stipulation, the total amount of the invoices due to Shallow Water for this time period, after deducting rent

paid by Ponchartrain, is $57,709.41. R. Doc. 90-1 at 2. Thus, Shallow Water's total

consequential damages in this case are $57,709.41.

42.     Ponchartrain argues that equitable considerations should bar Shallow Water from

recovering during this period because the parties were engaged in a legitimate dispute over the

scope of damages sustained by the GRANT during the course of the subcharter. R. Doc. 83 at 3;

94 at 5-6. It is true that "[e]quity is no stranger in admiralty," *Vaughan v. Atkinson*, 369 U.S.

527, 528 (1962). And Ponchartrain is correct that the parties' respective surveyors initially gave

damage estimates were either above (as to Shallow Water) or below (as to Ponchartrain) the

scope of damages that the parties ultimately agreed to during the September 2021 joint survey.

But it does not necessarily follow that Ponchartrain is absolved of liability for damages during

the period in which the repairs were in dispute.

43.     Initially, the Court notes that it is uncertain whether Ponchartrain's argument that equity

should preclude Shallow Water from recovering on its purely contractual claims is even tenable.

*See also Claimant ID 100235033 v. BP Expl. & Prod., Inc.*, 941 F.3d 801, 811 (5th Cir. 2019)

(expressing doubt that equitable doctrine of "unclean hands . . . applies when a party seeks relief

under a contract"); *see also CMA CGM S.A. v. AZAP Motors, Inc*., No. 2:14CV504, 2015 WL

9601157, at *7 (E.D. Va. Nov. 25, 2015), *report and recommendation adopted*, No. 2:14CV504,

2016 WL 50926 (E.D. Va. Jan. 4, 2016).

44.     But even if the Court were to weigh equitable considerations, it would find that they

militate in favor of casting Ponchartrain, as the tortfeasor, with the lost charter hire. To be sure,

Ponchartrain cannot be faulted for choosing not to charter the GRANT during the parties' months-long dispute. For the same reasons the Court discussed regarding TK Boat's decision not to charter the GRANT until after the joint survey, Ponchartrain acted sensibly in not hiring out the GRANT after January 2, 2021 while the parties were engaged in a bona fide dispute over the damages to the vessel. Likewise, Ponchartrain did not offer an unreasonable estimate of the damages to the GRANT. Indeed, the repairs (and their associated costs) that the parties' ultimately agreed to during their joint September 2021 survey were significantly closer to those recommended by Ponchartrain's surveyor, Qubed, in the winter of 2021 than those deemed necessary by Shallow Water's surveyor at around the same time.

45.    On the other hand, though, Ponchartrain is the wrongdoer in this case. But for its negligence, the dispute over damages sustained by the GRANT likely would not have arisen in the first place. In the end, one party—either Ponchartrain or Shallow Water—must bear the costs of the lost charter hire from January 11, 2021 to July 2, 2021. As between a tortfeasor, Ponchartrain, and its innocent victim, Shallow Water, the Court will lay the lost charter hire sustained by Shallow Water during this period at Ponchartrain's feet.

46.    In sum, Shallow Water is entitled to $57,709.41 in damages from Ponchartrain, exclusive of interest.

**C.    Shallow Water's Claim Against Continental**

47.    Last is Shallow Water's claim against Continental under the Miller Act, 40 U.S.C. §§ 3131 *et seq*.

48.     As noted, the work performed by the GRANT in Chocolate Bayou, Texas was performed under a performance bond issued by Continental pursuant to the Miller Act. Under that statute, Shallow Water is considered a first-tier subcontractor given its direct contractual relationship with Ponchartrain, a prime contractor. Per the terms of the statute, Shallow Water was required to bring its action against Continental no later than one year "after the day on which the last of the labor was performed or material was supplied by the person bringing the action." 40 U.S.C. § 3133(b)(4). The GRANT's work on the Chocolate Bayou project ended in or before September 2020. But Shallow Water did not file any action against Continental until December 1, 2020. Shallow Water's claim against Continental is therefore barred by the statute of limitations.

49.     Shallow Water contends, however, that the discovery rule should apply to this claim. R. Doc. 85 at 1-4. In general, the discovery rule defers the accrual of a cause of action until a plaintiff knew or, exercising reasonable diligence, should have known of the facts giving rise to a cause of action. *TIG Ins. Co. v. Aon Re, Inc.*, 521 F.3d 351, 357 (5th Cir. 2008) (applying Texas law). But even if the discovery rule applies to Miller Act claims—a question that has not been answered by the Fifth Circuit—it would provide no help to Shallow Water in this case. Keith Kraemer, a principal of Shallow Water, inspected the GRANT in September 2020 after the vessel had completed its work on the Chocolate Bayou project. Although Kraemer did not observe any damage to the barge, a more thorough inspection would have revealed the damage. Thus, if Shallow Water had exercised reasonable diligence in September 2020, it would have known of the damage to the vessel. So, assuming the discovery rule applies to Shallow Water's Miller Act cause of action, the cause of action began to accrue by the time Shallow Water inspected the GRANT in September 2020, and therefore the action is still time barred.

50.     Accordingly, Continental is entitled to judgment in its favor on Shallow Water's Miller

Act claim.

**D.     Judicial Interest**

51.     Finally, Plaintiffs ask this Court to award pre-judgment interest at the Louisiana state

rate. R. Doc. 72 at 7. Ponchartrain does not provide any argument on this issue.

52.     "Under maritime law, the awarding of prejudgment interest is the rule rather than the

exception, and, in practice, is well-nigh automatic." *Reeled Tubing, Inc. v. M/V Chad G,* 794

F.2d 1026, 1028 (5th Cir. 1986). Prevailing plaintiffs should only be denied prejudgment interest

where "peculiar circumstances" would make it inequitable for a defendant to pay such interest.

*Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 728 (5th Cir. 1980). Because no peculiar

circumstances are present here, Plaintiffs shall be awarded prejudgment interest.

53.     Courts award prejudgment interest "to compensate for the use of funds to which the

plaintiff was entitled, but which the defendant had use of prior to judgment." *Offshore Marine*

*Contractors, Inc. v. Palm Energy Offshore, L.L.C.*, 779 F.3d 345, 351 (5th Cir. 2015) (cleaned

up). In setting prejudgment interest rates, courts sitting in admiralty "enjoy broad discretion" and

"may look to the judgment creditor's actual cost of borrowing money, to state law, or to other

reasonable guideposts indicating a fair level of compensation." *Gator Marine Serv. Towing, Inc.*

*v. J. Ray McDermott & Co.,* 651 F.2d 1096, 1101 (5th Cir. Unit A July 1981) (internal citations

omitted).

54.     Given that this Court sits in Louisiana, the parties sustaining (and causing) damage are domiciled in Louisiana, and the incident giving rise to this action occurred in Louisiana, the Court exercises its discretion to apply the Louisiana prejudgment interest rate, as this rate amount will help fairly and appropriately compensate Plaintiffs for their loss of use of funds. *See Kenai Ironclad Corp. v. CP Marine Servs., LLC*, No. CV 19-2799, 2022 WL 1553486, at *9 (E.D. La. May 17, 2022); *see also Pillsbury Co. v. Midland Enterprises, Inc.*, 715 F. Supp. 738, 770 (E.D. La. 1989), *aff'd and remanded*, 904 F.2d 317 (5th Cir. 1990) (observing that "[t]he Fifth Circuit has upheld awards at the Louisiana legal rate" (first citing *Zim Israel Navigation Co. v. Special Carriers, Inc.,* 800 F.2d 1392, 1394–95 (5th Cir.1986) (per curiam); then citing *Transorient Navigators Co. v. M/S Southwind,* 788 F.2d 288, 293 (5th Cir. 1986)). Furthermore, although the subcharter between Shallow Water and Ponchartrain provides that "interest on any amounts not paid within 60 days of due date shall accrue interest at the rate of 1.5%/month, compounded daily," *Exhibit 1*, the Court finds this interest rate to be exorbitant and therefore will not apply it.

55.     The Louisiana rate of legal interest is fixed by statute. *See* La. R.S. §§ 9:3500; 13:4202. At the time both Plaintiffs began sustaining their losses, the judicial rate of interest was 3.5% per annum, compounded annually. Accordingly, Plaintiffs shall be awarded prejudgment interest at a rate of 3.5%, compounded annually. Shallow Water's prejudgment interest shall commence accruing on January 11, 2021, while TK Boat's prejudgment interest shall start accruing on July 2, 2021. Prejudgment interest for both Plaintiffs shall cease accruing on the date of judgment.

56.     Under 28 U.S.C. § 1961(a), post-judgment interest "shall be allowed on any money judgment in a civil case recovered in a district court. . . . Such interest shall be calculated from the date of the entry of the judgment" at the statutory rate. Generally, "costs – other than attorney's fees – should be allowed to the prevailing party." Fed. R. Civ. P. 54(d). Therefore, post-judgment interest shall be awarded from the date of the entry of judgment, to be calculated pursuant to 28 U.S.C. § 1961(a).

## III.   <u>CONCLUSION</u>

The Court summarizes it rulings as follows:

1. **IT IS ORDERED** that Ponchartrain is liable to TK Boat under general maritime law, with damages totaling $203,850, plus prejudgment interest at a rate of 3.5%, compounded annually, to begin accruing on July 3, 2021 until the date of judgment, and post-judgment interest in accordance with 28 U.S.C. § 1961(a).

2. **IT IS FURTHER ORDERED** that Ponchartrain is liable to Shallow Water in contract, with damages totaling $57,709.41, plus prejudgment interest at a rate of 3.5%, compounded annually, to begin accruing on January 11, 2021 until the date of judgment, and post-judgment interest in accordance with 28 U.S.C. § 1961(a).

3. **IT IS FURTHER ORDERED** that Continental has no liability to Shallow Water.

4. **IT IS FURTHER ORDERED** that Plaintiffs submit to the Court a proposed judgment consistent with this Order and Reasons within 3 working days.

New Orleans, Louisiana, this 30th day of August, 2022.

**UNITED STATES DISTRICT JUDGE**